Sandra RUFFIN; Catherine Ruffin, by and through her Guardian Ad Litem, C. Timothy Williford, Plaintiffs–Appellants,

v.

SHAW INDUSTRIES, INCORPORATED; Sherwin–Williams Company, Defendants–Appellees.

No. 94–1882.

United States Court of Appeals, Fourth Circuit.

Argued Jan. 29, 1996.

Decided July 16, 1998.

**ARGUED:** M. Lynn Jarvis, Raleigh, North Carolina, for Appellants. Michael Keith Kapp, Maupin, Taylor, Ellis & Adams, P.A., Raleigh, North Carolina, for Appellees. **ON BRIEF:** Armistead J. Maupin, Craig D. Mills, Maupin, Taylor, Ellis & Adams, P.A., Raleigh, North Carolina, for Appellees.

Before WIDENER and MOTZ, Circuit Judges, and PHILLIPS, Senior Circuit Judge.

Affirmed by published PER CURIAM opinion.

## OPINION

PER CURIAM:

Plaintiffs-appellants Sandra Ruffin and her daughter Catherine Ruffin sued defendants-appellees Shaw Industries, Inc. and Sherwin Williams Company, alleging a carpet manufactured by Shaw and sold by Sherwin Williams was defective. Following discovery, defendants moved for summary judgment and also filed a motion to strike the testimony of two of plaintiffs' experts, Dr. Rosalind C. Anderson, Ph.D. and Dr. Allan D. Lieberman, M.D. The district court granted defendants motion to strike the affidavit and testimony of Dr. Anderson on the grounds that her testimony was inadmissible under F.R.E. 702 and the reliability prong of the Supreme Court's decision in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993). Lacking Dr. Anderson's testimony, the court held as well that plaintiffs had failed to establish a genuine issue of material fact that the carpet was defective and granted summary judgment in defendants' favor.

Plaintiffs appeal and we affirm on Judge Dupree's thorough Memorandum of Decision which we adopt as our own and set out below:

Plaintiffs, Sandra Ruffin and her minor daughter, Catherine Ruffin, filed this products liability action against Sherwin Williams Company (Sherwin Williams) and Shaw Industries, Inc. (Shaw Industries) based on the sale and installation of defendants' carpet in plaintiffs' home. Plaintiffs' complaint was originally filed in the Superior Court Division of Wilson County, North Carolina but defendants removed the action to this court based on diversity of citizenship. The action is currently before the court on defendants' motion for summary judgment and their related motion to strike affidavits and testimony of plaintiffs' experts filed in response to defendants' motion for summary judgment.

In early October 1989, defendant Sherwin Williams' Boone, North Carolina store sold "Compelling Everglade" (Everglade) carpet to plaintiff Sandra Ruffin and arranged to have it installed in her home. The Everglade carpet was manufactured and marketed by Salem Carpet Mills, Inc. (Salem Carpet), who in May 1992 merged with Shaw Industries. Plaintiffs allege that shortly after the carpet was installed, they began experiencing physical symptoms such as nosebleeds, rashes, extreme sweating, chills, sleeplessness and racing of the heart. After repeated complaints by plaintiffs defendant

Sherwin Williams arranged for the carpet to be removed from plaintiffs' home at the end of October 1989. Plaintiffs allege that they have suffered severe toxic injuries as a result of chemicals in the Everglade carpet installed in their home.

On October 6, 1992, plaintiffs filed the complaint in the present action asserting claims for negligence, breach of implied warranty of merchantability, breach of express warranty and strict liability. Plaintiffs seek to hold Sherwin Williams liable as the retailer of the carpet and Shaw Industries liable as the corporate successor to the manufacturer, Salem Carpet. After discovery in the action had been completed, defendants filed the pending motion for summary judgment. Defendants subsequently moved to strike several affidavits plaintiffs filed in opposition to defendants' summary judgment motion.

## I. *MOTION TO STRIKE*

Because the testimony defendants seek to strike is essential for plaintiffs to withstand defendants' summary judgment motion, the court will address this motion first. Defendants move to strike the affidavit and testimony of plaintiffs' experts, Dr. Rosalind C. Anderson and Dr. Allan D. Lieberman. Defendants assert that pursuant to F.R.Civ.P. 56(e), the court cannot consider these affidavits in adjudicating their summary judgment motion because the designated experts state opinions not admissible under F.R.E. 702 and the standard recently established by the Supreme Court in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993).

In *Daubert*, the Court clarified the standard for admitting expert testimony under F.R.E. 702. Specifically, the Court held that the standard employed in a majority of circuits prior to adoption of the Federal Rules of Evidence, the so-called *"Frye* test," did not survive adoption of the federal rules. *Id.* at 587, 113 S.Ct. 2786. The *Frye* test required that scientific testimony be "generally accepted" as reliable in the relevant scientific community as a prerequisite to admitting such evidence. *Id.* at 585–86, 113 S.Ct. 2786. The Court held that the *Frye* test's "rigid 'general acceptance' requirement [was] at

odds with the 'liberal thrust' of the Federal Rules and their 'general approach of relaxing the traditional barriers to 'opinion' testimony.'" *Id.* at 588, 113 S.Ct. 2786 (citing *Beech Aircraft Corporation v. Rainey*, 488 U.S. 153, 169, 109 S.Ct. 439, 102 L.Ed.2d 445 (1988)).

In rejecting the *Frye* test, however, the Court noted that the rules did impose a duty on trial judges to make an initial determination, pursuant to F.R.E. 104(a), on the admissibility of scientific evidence. The substance of this determination is based on the language contained in F.R.E. 702 governing admissibility of scientific evidence and requires the court to determine: "whether the expert is proposing to testify to (1) scientific knowledge that (2) will assist the trier of fact to understand or determine a fact in issue." *Id.* at 592, 113 S.Ct. 2786. The Court stressed that this inquiry should be a "flexible one," and should focus on the "principles and methodology" employed and not the conclusions reached. *Id.* at 594–95, 113 S.Ct. 2786.

In attempting to delineate the inquiry required by Rule 702, the Supreme Court set forth a non-exclusive list of factors to consider in making the first determination of whether proffered testimony was sufficiently reliable to constitute scientific knowledge: (1) whether the theory or technique has been or could be tested; (2) whether the technique has been subject to peer review and publication; (3) the known or potential rate of error; and (4) the "general acceptance" of the technique by the relevant scientific community. *Id.* at 593–94, 113 S.Ct. 2786. The court noted that these factors, along with others the trial court considers relevant, should be weighed to determine the evidence's admissibility but stressed that no one factor should be dispositive. *Id.* at 595, 113 S.Ct. 2786. Thus, the primary significance of the Supreme Court's decision in *Daubert* was to make the "general acceptance" standard merely one factor in a multi-factor analysis, not the determinative test for admitting scientific evidence.

Further, as the *Daubert* court noted, in making preliminary determinations pursuant to Rule 104(a), the court is not bound by the

rules of evidence. F.R.E. 104(a); *Daubert*, 509 U.S. at 593 n. 10, 113 S.Ct. 2786. Thus, in determining whether to admit scientific testimony the court may consider materials not admissible in evidence.

■ The court first addresses defendants' objections to the affidavit and supporting testimony of Dr. Rosalind C. Anderson, which aver the following: Dr. Anderson is president of Anderson Laboratories (Anderson Labs) and received a masters degree and a Ph.D. in physiology from Yale University School of Medicine in 1964 and 1965 respectively. (Anderson Affidavit at Paras. 2 and 3.) At the request of plaintiffs' counsel Dr. Anderson analyzed a sample of the carpet removed from plaintiffs' home and stated that her testing demonstrated that the carpet sample was "biologically active and produced sensory irritation, pulmonary irritation, and neurological changes in mice, which are indicative that human beings would suffer similar biological responses." (*Id.* at Paras. 4 and 7.)

In her evaluation report, Dr. Anderson summarized the testing methodology she used in analyzing the section of carpet installed in plaintiffs' home (hereinafter referred to as "Anderson test"): A three-square-foot section of the carpet was placed in a sealed glass chamber (carpet chamber) and heated to 98 degrees Fahrenheit. Air was circulated through the carpet chamber into another glass chamber containing four mice (animal exposure chamber) at a rate of seven liters per minute for four, sixty-minute periods (exposure periods). Experimenters recorded the respiratory and pulmonary irritation responses of the four mice before, during and after the four exposure periods. Additionally, experimenters visually observed the mice at the end of each exposure period for visual indications of abnormal behavior or neurological signs and recorded these observations on a standard form. (Anderson Affidavit, Exhibit B, p. 2.)

Defendants have moved to strike Dr. Anderson's affidavit and testimony under the factors specifically identified by the *Daubert* Court and others not specifically listed but which defendants argue warrant exclusion of the evidence.

### 1. *Independent Testing or Validation*

■ The first factor identified by the *Daubert* Court as a "key question" in determining whether a technique can be considered reliable scientific knowledge is whether it has been tested and independently validated or replicated. Relating to the present case, Dr. Anderson's findings in a series of tests on carpet samples caused considerable public concern and spurred numerous attempts by the public and private sector to examine and replicate her results. (*See Potential Health Risks from Carpets and Carpeting Material: Hearing Before the House Subcommittee on Environment, Energy, and Natural Resources*, 103d Cong. 1st Sess. 1 (1993), attached to B. Richard Dudek Affidavit as Exhibit 2, pp. 1–2.)

Of these attempts to evaluate the "scientific reliability" of the Anderson test, defendants place primary reliance on a study by the Environmental Protection Agency's (EPA) Office of Research and Development (ORD). (*ORD Carpet Study, Toxicology Report: Evaluation of Off–Gassed Carpet Sample Atmospheres*, August 6, 1993, at p. I, attached to Dudek Affidavit as Exhibit 1.) The ORD study was a cooperative effort between Anderson Labs and the EPA to conduct simultaneous but separate tests on carpet samples previously identified by Anderson Labs as toxic. Based on these tests, the EPA and Anderson Labs prepared separate reports, which reached radically different findings and conclusions. (*Id.* at pp. iii–iv.)

The EPA drew the following conclusions from its findings:

> The bottom line from our studies … is that despite our best efforts, which were considerable … we have not been able to independently replicate the severe toxicity described by Anderson Laboratories. In fact, we were not able to produce any convincing signs of even mild toxicity attributable to carpet in our tests. Our present conclusion is that there must be an essential difference between the conditions of our experiments and those of Anderson

Laboratories, which, despite our efforts, we have not been able to identify.

*Id.* at pp. ii-iii. In addition to the EPA study, defendants rely on the studies of two private corporations, Monsanto Company and Dow Chemical Company, that also were unable to replicate Dr. Anderson's findings of toxicity and neurotoxicity in mice exposed to carpet samples. (Dudek Affidavit at Para. 7; William T. Stott Affidavit at Para. 7.)

In response, plaintiffs argue that the "protocol" of the experiments conducted by EPA and the private companies varied in significant respects from tests conducted by Anderson Labs. (Rosalyn C. Anderson Deposition, Vol. 2, pp. 23–24.) For example, one significant objection Dr. Anderson lodged against EPA's protocol was that, rather than using ambient air to conduct its experiment, EPA used a clean air source and added water to it before it entered the carpet chamber. (*Id.* at p. 23.) In response, defendants submitted an affidavit of one of the EPA researchers stating that using a clean air source and controlling the humidity amounts, rather than using unfiltered ambient air as Anderson Labs did, was necessary to achieve a standard, controlled set of conditions. (Jeffrey S. Tepper, Affidavit at Para. 6.) In his affidavit, Dr. Tepper also stated that the EPA's protocol was endorsed by a neutral group of peer reviewers prior to commencement of the ORD carpet study. (*Id.*; *see also* Dudek Affidavit, Exhibit 1, p. PR–11.)

Other than the difference in air sources, Dr. Anderson cites two other examples of problems with EPA's protocol she personally observed. First, Dr. Anderson asserts that she observed instances in which the air flow system was not connected to the animal exposure chamber. Second, Dr. Anderson claims that the animals were not positioned properly in the exposure chamber. (Anderson Deposition, Vol. 1, p. 139.) Unfortunately, however, Dr. Anderson's statements do not indicate at what date she made these observations or whether these problems were remedied prior to the EPA's tests resulting in the ORD carpet study. (*Id.*)

In addition to pointing out differences in the protocols of the experiments relied upon by defendants, plaintiffs proffer two instances which they allege show that Dr. Anderson's results were independently replicated. First, plaintiffs assert that in January 1993 part of EPA's team of scientists visited Anderson Labs and observed some of the same results reported in Dr. Anderson's findings. (Anderson Deposition, Vol. 1, p. 139; Dudek Affidavit, Exhibit 1, *ORD Carpet Study* at p. ii.) However, one of the EPA scientists asserts that this study did not constitute "replication" of Dr. Anderson's findings, as that term in understood in the scientific community, because the term implies the ability to achieve the "same results consistently and completely independently using the same test methodology in any laboratory." (Tepper Affidavit at Par. 10.) Because this test occurred at Anderson Labs and used their equipment, Dr. Tepper asserts it did not constitute independent replication. (*Id.*)

The second piece of evidence plaintiffs cite to support the reliability of the Anderson test is the results reached by Yves Alarie, Ph.D., Professor at the Graduate School of Public Health at the University at Pittsburgh. (*See* Anderson Deposition, Vol. 2, p. 23; *Toxicological Investigations of Carpet Z* attached to Dudek Affidavit as Exhibits 3 and 4.) Dr. Alarie's studies were able to partially replicate Dr. Anderson's results. For example, at the temperature used to evaluate plaintiffs' carpet sample, 98 degrees Fahrenheit, Dr. Alarie was able to replicate some of Dr. Anderson's results using her apparatus but was not able to do so with his own apparatus. (Dudek Affidavit, Exhibit 3 at p. 2, Exhibit 4 at pp. 17–18.) Using his own apparatus, Dr. Alarie was able to replicate Dr. Anderson's finding on sensory and pulmonary irritation and her finding for neurotoxicity for carpet Z when the sample carpet was heated to 158 degrees Fahrenheit, 60 degrees higher than the temperature used to evaluate plaintiffs' sample carpet. (Dudek Affidavit, Exhibit 3, pp. 12, 16.)

Defendants respond by noting that Dr. Alarie was not able to replicate the Anderson test using his own apparatus at the temperature at which the carpet sample from plaintiffs' home was tested. Further, defendants note that Dr. Alarie is Dr. Anderson's former

mentor and was the original inventor of the technique employed in the Anderson test. Thus, defendants argue that Dr. Alarie's study also did not constitute an independent replication.

In summary, the only evidence that Dr. Anderson's findings have been replicated under the same conditions as used in evaluating plaintiffs' carpet sample was the EPA and Dr. Alarie's use of Dr. Anderson's own apparatus on two occasions. No organization, public or private, has been able to independently obtain consistent findings using the techniques employed by Anderson Labs with their own equipment. Thus, plaintiffs have presented no evidence that the Anderson test methodology has been independently replicated, as that term is used in the scientific community.

### 2. Peer Review

Another "pertinent consideration" the *Daubert* Court identified in evaluating scientific evidence is whether the technique has been subject to peer review and publication. In the present case, the EPA's ORD carpet study contained four evaluations analyzing both the EPA and Anderson Labs toxicological studies. (Dudek Affidavit, Exhibit 1, pp. PR–1 to 27.) All four reviewers in the ORD carpet study concluded that the EPA's methodology was scientifically valid and superior to that conducted by Anderson Labs. (*See id* . at pp. PR–2, 7, 12, 20.) Although all four recommended further studies (*id.* at pp. PR–6, 7, 14, 25) they all expressed more confidence in the EPA's methodology and results than in those of Anderson Labs. (*Id.* at pp. PR–2, 7, 15, 20.) The most common criticisms of Anderson Labs' methodologies and procedures related to its failure to insure a "blinded" study, its failure to perform necropsies or autopsies on the deceased mice in the studies and irregularities in recording indications of sensory and pulmonary irritation. (*See, e.g., id.* at pp. PR–3, 4, 8, 12–13, 17, 19–20.)

In addition to the evaluations in the ORD study, defendants submitted affidavits stating that another panel of peer reviewers assembled by the EPA were generally supportive of the scientific methods employed by the EPA and private laboratories but critical of the scientific methods employed by Anderson Labs. (Dudek Affidavit at Para. 9; Stott Affidavit at Para. 9.) Plaintiffs, on the other hand, failed to submit any evidence of peer reviews supportive of Dr. Anderson's methodology or any proof that her studies had been published. Therefore, the uncontradicted evidence before the court demonstrates that peers in the relevant scientific community have been critical of the methodology employed by Anderson Labs but generally supportive of the procedures employed by EPA and private laboratories cited by defendants, which failed to independently replicate Dr. Anderson's findings.

### 3. General Acceptance

The evidence relating to the testing of the Anderson methodology and the accompanying peer review indicate that this technique is not generally accepted in the relevant scientific community. Moreover, defendants submitted affidavits of other toxicologists which explicitly state that the Anderson test methodology has not been generally accepted by the toxicological community as reliable. (Dudek Affidavit at Para. 10; Tepper Affidavit at Para. 16; Stott Affidavit at Para. 10.) Plaintiffs have not submitted any evidence that Dr. Anderson's technique has been generally accepted, notwithstanding her testimony that the scientific community has failed to come to any conclusion on her technique. (Anderson Deposition, Vol. 2, p. 26.)

### 4. Other Factors

The parties have submitted no evidence on the remaining factor identified by the *Daubert* Court—rate of error. However, because the *Daubert* Court recognized that the test should be a flexible one, defendants urge the court to consider other factors that they assert warrant striking Dr. Anderson's affidavit and testimony. Perhaps most significantly, defendants argue that although Dr. Anderson claims her test follows a protocol established by the American Society for Testing and Materials (ASTM E 981), her test varies in significant respects from the ASTM procedure. Specifically, defendants assert that although the ASTM E 981 proce-

dure was designed to measure only sensory irritation in laboratory animals, Dr. Anderson purports to use the test to measure neurotoxic effects through a functional observation test. Additionally, defendants note that Dr. Anderson's experiments dramatically exceed the exposure time for the mice, decrease the recommended air flow rates and heat the carpet samples, all contrary to the ASTM procedural guidelines. (See Dudek Affidavit at Para. 17; Exhibit 7, ASTM E 981 Standard Test Method for Estimating Sensory Irritancy of Airborne Chemicals, at Paras. 1.1, 3.1.1, 12.1.5, 12.2.3, 12.2.4, 13.5.) Defendants also cite Dr. Anderson's deposition testimony in a similar case stating that she decreased the air flow and increased the temperature in the carpet chamber to increase the likelihood of observing neurological changes. (Anderson Deposition, Amara case, Vol. 1., p. 49.) Thus, defendants argue that Dr. Anderson's test should be treated with great skepticism because she manipulated the ASTM E 981 protocol for the express purpose of producing a neurological effect in the mice.

Defendants also assert that numerous other factors compel rejection of Dr. Anderson's testimony. They argue that Dr. Anderson's neurological findings are particularly unreliable because her assistant, Scott Hopkinson, who was responsible for performing the subjective functional analysis, had no formal training. Further, defendants assert that Mr. Hopkinson was not "blinded" as to which animals had been exposed and which mice were in the control groups. Therefore, defendants contend that because Mr. Hopkinson had no formal training and could have been biased by his knowledge of which mice had been exposed, his subjective visual observation findings should be rejected.

Defendants also cite Dr. Anderson's admitted failure to follow the so-called "Good Laboratory Practices," a series of protocols designed to insure quality-assurance and quality-control in laboratory studies. (Anderson Deposition, Vol. 1, p. 134; Marco Paul Johann Kaltofen Affidavit at pp. 76–77.)

Finally, defendants note that some attempts to replicate the Anderson test have found that the Anderson procedure and apparatus, independent of the chemicals tested, caused physical injury and death to some mice. (Dudek Affidavit at Para. 14.) In particular, some labs have found that the collar used to restrain the animals can cause reduced blood flow in the head and brain of the mice and the high air temperatures can cause cellular changes in the brains of the mice. (Dudek Affidavit at Paras. 14 and 15.) Plaintiffs fail to respond to any of the additional factors set forth in defendants' motion to strike.

Analyzing the factors specifically set forth in Daubert and the additional ones alleged by defendants, the court finds pursuant to F.R.E. 104(a) by a preponderance of the evidence that Dr. Anderson's testimony is not admissible under F.R.E. 702 and the Supreme Court's "reliability" prong established in Daubert. Thus, because Dr. Anderson's testimony would not be admissible in evidence pursuant to F.R.Civ.P. 56(e), her affidavits and deposition testimony cannot be considered in determining defendants' summary judgment motion. See Porter v. Whitehall Laboratories, Inc., 9 F.3d 607, 612, 616 (7th Cir.1993) (affirming summary judgment for defendants based on refusal to consider plaintiffs' affidavit of experts because the affidavits were not admissible under F.R.E. 702 and the standards set forth in Daubert ). Therefore, the court grants defendants' motion to strike the affidavits and deposition testimony of Dr. Anderson.[1]

## II. SUMMARY JUDGMENT MOTION

The court next addresses defendants' motion for summary judgment. On a motion for summary judgment, a court must grant the motion if the parties' pleadings, depositions, interrogatory answers, admissions and any affidavits show there is no genuine issue of material fact and the moving party is entitled to judgment an a matter of law. F.R.Civ.P. 56(c); Celotex Corporation v. Catrett, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The party moving for

---

1. Based on the court's finding below that without Dr. Anderson's testimony plaintiffs have failed to raise a genuine issue of fact on all their claims, it is unnecessary to consider defendants' motion to strike the affidavit and testimony of Dr. Lieberman.

summary judgment has the initial burden of demonstrating the absence of any material issue of fact, but need not support its motion with affidavits or other materials negating the non-moving party's claim. *Celotex,* 477 U.S. at 323, 106 S.Ct. 2548.

Once the moving party meets its initial burden, the non-moving party may not rely upon mere allegations or denials contained in its pleadings, but must come forward with some form of evidentiary material allowed by Rule 56 demonstrating the existence of a genuine issue of material fact requiring a trial. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248–49, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Celotex,* 477 U.S. at 324, 106 S.Ct. 2548. In other words, to withstand a motion for summary judgment, the non-moving party must proffer sufficient evidence on which a reasonable jury could find in its favor. *Anderson,* 477 U.S. at 248, 106 S.Ct. 2505. In considering the motion, the court must view the facts and inferences to be drawn from the evidence in the light most favorable to the non-moving party to the extent those inferences are reasonable. *Matsushita Electrical Industrial Company v. Zenith Radio Corporation,* 475 U.S. 574, 597–88, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).

### A. Negligence and Breach of Implied Warranty of Merchantability

■ Plaintiffs' first two related causes of action are for negligence and for breach of an implied warranty of merchantability. To establish a claim for negligence based on a defective product plaintiffs must establish that: (1) the product was defective; (2) the defendants were negligent in their manufacture, design, inspection or sale of the product; and (3) defendants' negligence proximately caused injury to plaintiffs. *Driver v. Burlington Aviation, Inc.,* 110 N.C.App. 519, 527, 430 S.E.2d 476, 483 (1993); *Jolley v. General Motors Corporation,* 55 N.C.App. 383, 385, 285 S.E.2d 301, 303 (1982).

■ To establish a claim for breach of implied warranty, plaintiffs must establish that: (1) the product was subject to an implied warranty of merchantability; (2) the product breached the warranty because it

was defective at the time of sale; and (3) the defect proximately caused injury to the plaintiff. *Jolley,* 55 N.C.App. at 385–86, 285 S.E.2d at 303. Because the requirements for these two causes of action are so nearly alike, courts have held that a finding on one claim often "applies equally" to the other. *See Penland v. BIC Corporation,* 796 F.Supp. 877, 885 (W.D.N.C.1992).

■ For both of the first two claims, plaintiffs must establish the existence of a defect in the carpet installed in their home. With their motion for summary judgment, defendants submitted the affidavit of Larry D. Winter, an analytical chemist for Minnesota Mining and Manufacturing Company (3M). Mr. Winter specializes in the analysis of fluorochemicals such as those used in the manufacturing of 3M's "Scotchguard" carpets, the type involved in the present case. (Winter Affidavit at Paras. 2 and 3.) At the request of Ken Padgett of Salem Carpets, Mr. Winter analyzed a sample of carpet removed from plaintiffs' home and found a "fluorochemical compound" identified as 3M's "Scotchguard Stain Release," and other "chemicals commonly found in residential carpets," but no "unusual materials." (*Id.* at Para. 5.) Defendants assert that Mr. Winter's affidavit establishes that the particular carpet installed in plaintiffs' home did not contain any defect.

Other than Dr. Anderson's affidavit and testimony, which this court has stricken, plaintiffs' only other potential evidence of a defect in the carpet is the statements attributed to Roger L. Parker, the manager of the Sherwin Williams store that sold the carpet to Ms. Sandra Ruffin. In her deposition, Sandra Ruffin alleged that two weeks after installing her carpet and in response to her repeated complaints, Roger Parker told her that he had spoken to Salem Carpet and that "[y]our carpet got in a bad batch of chemicals and is highly toxic." (Sandra A. Ruffin Deposition at p. 160.) As corroboration, plaintiffs submitted the affidavit of the individual who installed and removed the carpet from plaintiffs' home, Steve Archer. In his affidavit, Mr. Archer avers that Roger Parker also told him that the carpet he installed in plaintiffs' home "got in a bad batch of chemicals." (Archer Affidavit at Para. 5.)

Although defendants argue that these statements are hearsay and double hearsay, for the purposes of this motion, the court accepts them as admissible admissions of a party opponent. Notwithstanding their admissibility, however, these statements are insufficient to create a genuine issue of material fact on the existence of a defect in the carpet installed in plaintiffs' home. Although the affiants could testify that Mr. Parker made such remarks, his alleged comments do not purport to offer any factual basis for the conclusory statement that the carpet installed in plaintiffs' home "got in a bad batch of chemicals." Without a factual basis for the conclusory comments, Mr. Parker would not be competent to testify as to the existence of a defect in the carpet, and therefore his alleged statements cannot create a genuine issue of fact on the existence of a defect. *See* F.R.Civ.P. 56(e); F.R.E. 602, 701.

In other words, presented with the testimony of Larry Winter stating that a chemical analysis of the carpet identified no unusual materials or chemicals and the statements attributed to Mr. Parker, no reasonable jury could find that the carpet installed in plaintiffs' home contained such a defect, and the court would be compelled to set aside such a verdict if a jury so found. Thus, the statements attributed to Roger Parker are insufficient to create a genuine issue of material fact on the existence of a defect in the carpet installed in plaintiffs' home.

Consequently, plaintiffs have failed to create a genuine issue of fact on an essential requirement of both their negligence and breach of implied warranty of merchantability claims. Therefore, the court will grant summary judgment for defendants on both these claims.[2]

### B. *Breach of Express Warranty*

Plaintiffs' failure to produce evidence of a defect also mandates dismissal of their breach of express warranty claims. Nonetheless, an independent basis exists for dismissing this claim. Under N.C.G.S. § 25–2–313, an express warranty is created by "[a]ny affirmation of fact or promise made by the seller to the buyer which relates to the goods and becomes part of the basis of the bargain." N.C.G.S. § 25–2–313($l$)(a) (1986). However, "an affirmation merely of the value of the goods or a statement purporting to be merely the seller's opinion or commendation of the goods does not create a warranty." *Id.* § 25–2–313(2).

■ In the present case, plaintiffs rely on the statements of Roger Parker, the Sherwin Williams store manager, to support their claim for breach of an express warranty. In his deposition, Mr. Parker states that he told Sandra Ruffin that the Everglade carpet "was a higher quality carpet than what she [Ms. Ruffin] brought in [to the store]." (Roger L. Parker Deposition at p. 12.) Plaintiffs also rely on Mr. Parker's statement to Ms. Ruffin that she was getting "a very good grade of material." (*Id.* at p. 13.)

These statements are merely "puffing" or Mr. Parker's opinion or commendations on the product's value. *See Performance Motors, Inc. v. Allen,* 280 N.C. 385, 393–94, 186 S.E.2d 161, 166 (1972) (statement that product "was supposed to last a lifetime and be in perfect condition" was an expression of opinion and did not create an express warranty); *Warzynski v. Empire Comfort Systems, Inc.,* 102 N.C.App. 222, 226, 401 S.E.2d 801, 803–04 (1991) (affirming summary judgment based on finding that advertisement purporting to sell "America's most complete line of reliable economical gas heating appliances" was merely puffing and could not create an express warranty as a matter of law); *see also Delta Marine, Inc. v. Whaley,* 813 F.Supp. 414, 420 (E.D.N.C.1993) (granting summary judgment on breach of express warranty claim because alleged statement that product would "do a good job" was not sufficient as a matter of law to create an express warranty). Accordingly, the statements relied upon by plaintiffs are insufficient to create an express warranty and plaintiffs' claim for breach of such a warranty must be dismissed on this independent ground.

---

**2.** Because the court holds that plaintiffs failed to raise a genuine issue of fact on the existence of a defect, it is unnecessary to analyze plaintiffs' evidence relating to any other elements, such as causation or injury.

### C. Strict Liability

■ The absence of evidence of a defect also warrants dismissal of plaintiffs' claims for strict products liability. However, another independent basis exists for dismissing plaintiffs' strict liability claim. North Carolina has not recognized a cause of action for strict liability in products liability cases. *See Smith v. Fiber Controls Corporation,* 300 N.C. 669, 678, 268 S.E.2d 504, 509–10 (1980) (refusing to adopt strict liability in products liability cases in light of North Carolina legislature's failure to adopt such a theory in enacting Chapter 99B of North Carolina General Statutes governing products liability actions); *Warren v. Colombo,* 93 N.C.App. 92, 102, 377 S.E.2d 249, 255 (1989). Moreover, to the extent North Carolina law recognizes claims for strict liability in any context, such claims exist only for ultra hazardous activities. *See Woodson v. Rowland,* 329 N.C. 330, 351, 407 S.E.2d 222, 234 (1991); *Driver v. Burlington Aviation, Inc.,* 110 N.C.App. 519, 530, 430 S.E.2d 476, 483–84 (1993). The court holds as a matter of law that even if North Carolina recognized strict products liability claims, the sale and installation of carpet cannot be considered an ultra hazardous activity, and, thus, plaintiffs' claims for strict liability must be dismissed on this independent ground. *See Driver, supra* (affirming dismissal of strict liability claim based on manufacturer's failure to properly instruct pilot on risk of carburetor icing in small passenger aircraft); *see also Woodson, supra* (noting that North Carolina courts have not recognized any activity, other than blasting, as ultra hazardous).

### CONCLUSION

Defendants' motion to strike the affidavit and testimony of Dr. Rosalind Anderson will be granted pursuant to F.R.Civ.P. 56(e) because her opinion testimony would not be admissible under F.R.E. 702 and the Supreme Court's recently announced standard in *Daubert.* Without such evidence, plaintiffs have failed to raise a genuine issue of fact on an essential element of all four of their claims a defect in the carpet installed in plaintiffs' home. Alternatively, independent grounds support dismissal of plaintiffs' claims for breach of an express warranty and strict liability. Thus, the court will grant summary judgment on all plaintiffs' claims and dismiss this action.

The judgment of the district court is accordingly

*AFFIRMED.*