A02A1279. ORKIN EXTERMINATING COMPANY, INC.
v. CARDER et al.
(575 SE2d 664)

PHIPPS, Judge.

Edward Carder sued Orkin Exterminating Company, Inc. to recover for personal injuries sustained as a result of exposure to pesticides Orkin applied at his workplace. As co-plaintiff, Carder's wife sued for loss of consortium. The jury returned a verdict in favor of Carder only, for $250,000 in compensatory damages and $2,300,000 in punitive damages. The trial court entered judgment on the verdict, awarding Carder $250,000 in compensatory damages but reducing the award of punitive damages to $250,000 under OCGA § 51-12-5.1 (g). Following denial of its alternative motion for judgment notwithstanding the verdict (j.n.o.v.) or new trial, Orkin appeals.

Orkin challenges the scientific reliability of a testing procedure used by one of Carder's experts to establish a causal link between its pesticide applications and Carder's injuries. Orkin also claims that the evidence was insufficient to support the award of punitive damages. Resolving these and other issues adversely to Orkin, we affirm.

Carder was an employee of Cobb Electric Membership Corporation (Cobb EMC) in its Marietta office. In July 1989, Orkin began providing pest control services to a new building in which Carder worked. Orkin applied the following pesticides: Whitmire PT270 Dursban (Dursban), Whitmire PT280 Orthene (Orthene), and Whitmire PT565 Plus Pyrethrin (Pyrethrin). In November 1989, Carder experienced a sudden outbreak of skin lesions. He also began to experience a sensitivity to cold in the area of the lesions, severe muscle and joint pain, and a resulting general malaise.

Carder claims that these symptoms developed into a serious and permanent illness attributable to his exposure to the Dursban, Orthene, and Pyrethrin applied by Orkin in the building in which he worked. Carder charges Orkin's employees with negligence in applying these pesticides, and he charges Orkin with negligence in failing to train and supervise its employees in the proper application of the pesticides. At trial, Carder presented evidence that Orkin service technicians violated federal law by failing to comply with label instructions requiring at least two of the subject pesticides to be applied only by injection into cracks and crevices. Numerous Cobb EMC employees testified that they observed Orkin technicians spraying the pesticides in the open air in areas which included Carder's work station. Carder also presented evidence that Georgia law required Orkin to keep records showing, among other things, the amounts of pesticides it was applying, and that Orkin regularly violated this law by allowing its service technicians to omit this information from their service tickets.

Carder's symptoms diminished when he was away from the building and increased when he was in the building. Numerous medical tests were performed without revealing the cause of the symptoms. Carder sought relief by restricting his diet and moving out of his home, but to no avail.

In 1991, Carder sought treatment from Dr. Thomas Lawley, a dermatologist. Lawley diagnosed Carder's skin condition as "probable Sweet's Syndrome." A sample of Carder's skin was analyzed by a dermatopathologist who concurred with Lawley's diagnosis. Lawley prescribed a steroid treatment of prednisone, which improved Carder's condition.

To determine the cause of Carder's symptoms, Lawley referred him to Dr. Howard Frumkin, a physician who specialized in epidemiology. Frumkin first saw Carder in early 1992. Frumkin concluded that a process known as "challenge testing" was the only way to determine whether there was a causal link between Carder's exposure to the pesticides being applied at his place of employment and his outbreak of symptoms. Frumkin described challenge testing as follows:

> [I]t may sound exotic but it's common sense testing. It's commonly used in medicine. The idea is if you suspect that an exposure is making a person sick, you test it by exposing the person to it. And if it makes the person sick, and if a placebo or a sham exposure doesn't make the person sick, then that strengthens your belief that it's that exposure that's making the person sick. So, for example, in cardiology, if you think that exertion strains a person's heart, you simply put the person on a treadmill. It's called a stress test. You expose the person to that exposure, which is exertion, and see if it makes the person's heart show signs of strain. Or an allergy testing, where an allergen is making a person sick, you expose the person to the allergen through skin testing or prick testing. Very similar to my field in occupational and environmental medicine, same theory, if you think that a particular chemical is making a person sick, you expose the person to the chemical and observe carefully to see whether the symptoms occur.

Frumkin obtained a spray bottle of each of the three pesticides from the manufacturer, Whitmire. He took six large glass jars and put a mixture of the three pesticides into three of the jars and placebos into the other three jars. Frumkin sprayed the same amount of each of the pesticides into each of the three jars through one-second bursts from each spray bottle. He then began a series of tests during

which Carder was exposed to both the pesticides and placebos. During each test in Frumkin's office, he would place one of the bottles next to Carder, take the top off the bottle, and expose Carder to it for about ten minutes. Then Frumkin would recap the bottle. Generally, Carder would put his hand in the bottle and get some of the liquid on his skin, let it sit there for a couple of minutes, and then wash it off. Carder would sit in the waiting room for about four hours after his ten-minute exposure. He would then leave and report his reaction either by contacting Frumkin a few days later or at his next visit.

Initially, Frumkin was concerned that Carder would smell the pesticides and become aware of the identity of the substances to which he was being exposed, thereby rendering the test results less reliable. As a result, Frumkin took measures to prevent Carder from being able to tell whether he was being exposed to pesticides or placebos.[1] At first, Frumkin tried to mask the smell of the pesticides by putting vinegar into the mixture during the first test at which Carder was exposed to the pesticides. But Frumkin concluded that the vinegar probably changed the chemical structure of the pesticides, so he found another way to mask the smell of the pesticides during the remaining tests.

At the first test, Carder was exposed to a placebo; he experienced mild symptoms. At the second test, he was exposed to the pesticide and vinegar mixture, and he experienced no symptoms. At the third test, he was exposed to the pesticide mixture, which produced a severe reaction involving all the symptoms he had previously experienced. At the fourth test, Carder's exposure to a placebo produced no reaction; at the fifth test, his exposure to the pesticides produced another severe reaction; and at the sixth test, his exposure to the placebo again produced no reaction.

Based on these results — as well as the exclusion of other causes, and the temporal relationship between the onset of Carder's symptoms and his exposure to the pesticides at his workplace — Frumkin concluded that Carder had experienced an atypical or "idiosyncratic" reaction or sensitivity to these pesticides. He explained that Carder's sensitivity was atypical in the sense that his symptoms were not typical allergic reactions such as runny eyes, sore throat, or skin hives.

1. Orkin first contends that the trial court erred in allowing Dr. Frumkin to testify about the challenge tests he performed on Carder.

Orkin argues that the challenge testing done by Frumkin failed

---

[1] Frumkin referred to this as "blinding" the subject. In "double blind" testing, neither the subject nor the person conducting the test knows whether a placebo is being used.

to satisfy the basic standard governing the admissibility of scientific evidence in *Harper v. State*.[2]

The test in Georgia for "determining whether a given scientific principle or technique is a phenomenon that may be verified with such certainty that it is competent evidence in a court of law" was first set out in *Harper*[, supra]. Unlike other states that base admissibility on whether the technique has gained general acceptance in the applicable scientific community, in Georgia it is proper for the trial judge to decide whether the procedure or technique in question has reached a scientific stage of verifiable certainty, or in the words of Professor Irving Younger, whether the procedure "rests upon the laws of nature." The trial court may make this determination from evidence presented to it at trial by the parties; in this regard expert testimony may be of value. Or the trial court may base its determination on exhibits, treatises or the rationale of cases in other jurisdictions. [Cit.][3]

The significant point is that the trial court makes this determination based on the evidence available to him rather than by simply calculating the consensus in the scientific community. Once a procedure has been recognized in a substantial number of courts, a trial judge may judicially notice, without receiving evidence, that the procedure has been established with verifiable certainty, or that it rests upon the laws of nature.[4]

"The decision as to whether a procedure has reached the requisite standard of verifiable certainty and scientific reliability is a matter within the discretion of the trial court."[5]

In this case, Carder presented evidence from which the court was authorized to find that challenge testing is a procedure that meets the requisite certainty and reliability standard, that it has also gained general acceptance in the scientific community, and that it rests upon principles akin to the laws of nature,[6] so that it is competent evidence under both pre-*Harper* and post-*Harper* Georgia law.

---

[2] 249 Ga. 519, 524 (1) (292 SE2d 389) (1982).

[3] *Cheatwood v. State*, 248 Ga. App. 617, 619 (1) (548 SE2d 384) (2001).

[4] *Harper*, supra at 526.

[5] (Footnote omitted.) *Leftwich v. State*, 245 Ga. App. 695 (538 SE2d 779) (2000).

[6] "Laws of nature" is an expression that has been used in conjunction with the term "common sense." See *Hawkins v. State*, 223 Ga. App. 34, 36 (1) (476 SE2d 803) (1996). To a degree, the reliability of challenge testing rests upon rules of logic, which are akin to common sense.

Understandably, therefore, Orkin does not really question the reliability of challenge testing as such. Orkin's real complaint relates to Frumkin's methodology for applying this testing procedure and his resulting conclusion linking Carder's symptoms to pesticide exposure despite the fact that there is nothing in medical literature supporting such a link.

Orkin challenges the reliability of Frumkin's testing procedure because the tests he administered were not "double blinded";[7] the methodology he employed has not been tested by others and, therefore, has no known rate or potential rate of error; and Frumkin failed to establish a written protocol for the testing, publish the test results in some work of medical literature, or subject the test results to peer review. Factors such as these, however, are taken into consideration by federal courts primarily in determining the validity of the theory or technique itself, as opposed to one experimenter's application of the technique.[8] Such a determination is made pursuant to the test established by the United States Supreme Court in *Daubert v. Merrell Dow Pharmaceuticals*.[9] Because *Daubert* involved application of a federal evidentiary rule which has not been adopted in Georgia, *Daubert* has not been adopted in Georgia either.[10] Therefore, we do not apply *Daubert* here.

One of Orkin's other complaints relates to the fact that Frumkin exposed Carder to a mixture of all three pesticides, whereas the evidence undisputably shows that Orkin did not apply one of the pesticides, Dursban, to the Cobb EMC building until September 1990, approximately one year after Carder had already begun to exhibit symptoms. The evidence, however, is equally undisputed that Orkin was applying the other two pesticides, Orthene and Pyrethrin, from the beginning, and that Carder continued to experience the symptoms after Dursban began to be applied at his workplace. Although it is true that Frumkin's experiment does not exclude the possibility that the Dursban alone caused Carder's reactions, it does show that a mixture of all three chemicals consistently produced the reactions whereas his exposure to a placebo did not.

The trial court did not abuse its discretion in ruling that the challenge testing procedure, as administered by Frumkin, was sufficiently reliable to warrant admission of the test results in evidence, and that any absence of safeguards or controls that might have been

---

[7] See note 1, supra.

[8] See *Ruffin v. Shaw Indus.*, 149 F3d 294 (4th Cir. 1998); *Summers v. Missouri Pacific R. System*, 132 F3d 599 (10th Cir. 1997).

[9] 509 U. S. 579 (113 SC 2786, 125 LE2d 469) (1993).

[10] See *Norfolk Southern R. Co. v. Baker*, 237 Ga. App. 292, 294 (1) (514 SE2d 448) (1999), citing *Orkin Exterminating Co. v. McIntosh*, 215 Ga. App. 587, 591 (4) (452 SE2d 159) (1994).

present in more formalized testing, or any flaws in his methodology, related to the weight to be given the test results rather than to their admissibility in evidence.[11]

2. Orkin next contends that the trial court erred by denying its motion for j.n.o.v. as there was no conflict in the evidence as to various issues relating to the causation and damage elements of Carder's claims.

(a) Orkin argues that it should have been granted a j.n.o.v. on the issue of whether the subject pesticides caused Carder's illness because his two physicians, Lawley and Frumkin, presented conflicting evidence of the cause of Carder's symptoms. Orkin also argues that it was entitled to a j.n.o.v. on the issue of whether the subject pesticides were applied by Orkin in violation of label instructions because one of Carder's witnesses testified that no violation occurred. These arguments are wholly without merit.

First, a motion for j.n.o.v. is properly denied unless there is no conflict in the evidence as to any material issue, and the evidence introduced, with all reasonable deductions therefrom, demands a particular verdict; the standard of appellate review is whether there is any evidence to support the verdict.[12] Orkin has presented no authority in support of its argument that a conflict in the plaintiffs' own evidence entitles the defendant to a j.n.o.v.

Moreover, Lawley's diagnosis of Carder's condition as "probable Sweet's Syndrome" was not inconsistent with Frumkin's determination that the cause of the condition was pesticide exposure. As explained by Frumkin,

> [Sweet's syndrome] is a rare and unusual situation. In many cases nobody knows what the cause is. In many cases it occurs as an accompaniment of cancer. It's kind of a side effect of cancer, and in some cases it's a reaction to a medication, but it really is, it's a poorly understood condition. It's mostly something that we see under a microscope. So it's comparable to saying, well, the patient has a scab. What could have caused the scab. Well, lots of things. The patient has a particular look under a microscope in a skin biopsy, and this looks like Sweet's Syndrome, but again the question is very open about what could have caused this in this patient.

And the testimony that Orkin did not violate label instructions in applying the subject pesticides came from a witness who had been

---

[11] See *J. B. Hunt Transport v. Brown*, 236 Ga. App. 634, 635 (1) (a) (512 SE2d 34) (1999); *Hawkins*, supra at 38 (1).

[12] See *Halta v. Bailey*, 219 Ga. App. 178, 180 (2) (464 SE2d 614) (1995).

employed by Orkin but whose employment had ended by the time of trial, so that the Carders were required to call him as their own (potentially hostile) witness. Certainly, Carder is not bound by this witness's testimony.

(b) Orkin claims that it was entitled to a j.n.o.v. because Carder's symptoms were not a foreseeable result of exposure to pesticides.

> With reference to foreseeability of injury, the correct rule is that in order for a party to be held liable for negligence, it is not necessary that he should have been able to anticipate the particular consequences which ensued. It is sufficient if, in ordinary prudence, he might have foreseen that some injury would result from his act or omission, and that consequences of a generally injurious nature might result.[13]

Adequate evidence was presented from which the jury could have found that it was foreseeable to Orkin that someone in the office building would suffer personal injury as a result of exposure to the subject pesticides if improperly applied.

(c) Orkin argues that it was entitled to a j.n.o.v. on Carder's claim for punitive damages.

"Punitive damages may be awarded only in such tort actions in which it is proven by clear and convincing evidence that the defendant's actions showed willful misconduct, malice, fraud, wantonness, oppression, or that entire want of care which would raise the presumption of conscious indifference to consequences."[14] The evidence supports a finding that Orkin displayed a conscious indifference to the possible infliction of personal injury on its customers as a result of their exposure to pesticides misapplied by Orkin technicians. In this case, as in most others, a jury question was created whether clear and convincing evidence of such conduct exists.[15]

3. Orkin complains of the trial court's admission of similar transaction evidence.

This evidence consisted of complaints by Orkin customers concerning misapplication of pesticides by Orkin technicians. Orkin argues that the evidence should not have been admitted because none of the complaints involved Orkin's service of Carder's workplace or were shown to have resulted in human illness. The complaints,

---

[13] (Citation and punctuation omitted.) *Wallace v. Sears, Roebuck & Co.*, 196 Ga. App. 221, 222-223 (396 SE2d 41) (1990).

[14] OCGA § 51-12-5.1 (b).

[15] See *Thomas v. Atlanta Cas. Co.*, 253 Ga. App. 199, 206 (3) (f) (558 SE2d 432) (2001) (physical precedent only); *Paul v. Destito*, 250 Ga. App. 631, 639 (7) (550 SE2d 739) (2001); *Baumann v. Snider*, 243 Ga. App. 526, 530 (3) (532 SE2d 468) (2000).

however, did relate to Orkin technicians misapplying the pesticide Dursban, resulting in Orkin customers being exposed to this pesticide. The trial court did not abuse its discretion in finding this evidence relevant.[16]

4. Orkin contends that the court erred by denying its motion for mistrial when a former employee of Orkin testified on direct examination by plaintiffs that Orkin had threatened to terminate him for racial reasons.

The court promptly gave a curative instruction to the jury. It later denied the motion for mistrial, finding that the Carders had not intentionally elicited the testimony concerning race, and that the testimony was not so prejudicial that its adverse effect could not be eradicated from the minds of the jury by the cautionary instruction. We find no abuse of discretion.[17]

5. Orkin contends that the court erred in allowing the Carders to impeach the testimony of one of their own witnesses.

The impeached witness was another former Orkin employee whom the Carders were required to call as their own (potentially hostile) witness. At trial, the Carders sought to introduce selected portions of the witness's deposition. At the insistence of Orkin's counsel, the entire deposition was read to the jury, even though the trial court noted that most of the deposition was irrelevant. During the latter part of the deposition, the witness testified that one of Orkin's service technicians was an excellent employee. The court allowed the Carders to impeach this testimony with evidence that the witness himself had reprimanded the employee numerous times.

If only part of a deposition is offered in evidence by a party, OCGA § 9-11-32 (a) (5) provides that an adverse party may require the party offering only part of the deposition to introduce all of it which is relevant to the part introduced, and that any party (including an adverse party) may introduce any other parts. *Thico Plan, Inc. v. Ashkouti*[18] recognized that where one party introduces part of a deposition, an adverse party has not "introduced evidence" so as to give up his right to opening and closing argument by exercising his right to introduce other, relevant parts of the deposition. By analogy to *Thico*, Orkin argues that by requiring the reading of all of its former employee's deposition, it did not make him its own witness (so that he could be impeached by the Carders under the circumstances present here). In this case, however, unlike *Thico*, it appears that the portion of the deposition which contained a reference to the supposed

---

[16] See generally *Goss v. Total Chipping*, 220 Ga. App. 643, 644 (2) (a) (469 SE2d 855) (1996).

[17] See, e.g., *Dubose v. Ross*, 222 Ga. App. 99, 100 (473 SE2d 179) (1996).

[18] 171 Ga. App. 536, 537 (2) (320 SE2d 604) (1984).

excellence of the former Orkin employee was not relevant to those parts of the deposition submitted by the Carders. Therefore, the trial court was authorized to find that, by insisting that that part of the deposition be read to the jury, Orkin had made the witness its own.[19]

6. Finally, Orkin contends that the court erred by allowing the Carders to introduce evidence of Orkin technicians' service tickets.

Orkin objected to this evidence at trial, based on a lack of connection between the rules violations which these tickets evidenced and Carder's injuries. Because the service tickets showed reporting violations related to the amounts of pesticides being applied in Carder's building during the extended period in which his exposure allegedly occurred, the court overruled Orkin's objection. As the evidence was clearly relevant, we find no abuse of discretion.

*Judgment affirmed. Mikell, J., concurs fully in the judgment, concurs fully in Divisions 1, 2 (a) and (b), 3, 4, 5 and 6 and concurs specially in Division 2 (c). Andrews, P. J., concurs in the judgment only.*

MIKELL, Judge, concurring generally and specially.

I fully concur in Divisions 1, 2 (a) and (b), 3, 4, 5, and 6 and in the judgment. I concur specially in Division 2 (c), because it does not address the changed standard of appellate review required by the General Assembly's 1987 enactment of OCGA § 51-12-5.1. That statute required that the evidence be "clear and convincing."[20]

The appellant enumerates as error the trial court's failure to grant a judgment notwithstanding the verdict on the issue of punitive damages.[21] The majority, in asserting that conflicting evidence presented a jury issue under a clear and convincing standard cites decisions which depend ultimately on precedents decided before the 1987 amendment. For example, the majority cites *Paul v. Destito*,[22] a 2001 decision citing *Crosby v. Kendall*[23] and *Home Ins. Co. v. Wynn*.[24] *Crosby* also relies on *Home Ins. Co.*, as well as *Caswell v. Jordan*,[25] a case that is physical precedent only. Significantly, *Home Ins. Co.* does not mention OCGA § 51-12-5.1 or the necessity for clear and convinc-

---

[19] See OCGA § 9-11-32 (c) (introduction in evidence of deposition or any part thereof for any purpose other than contradicting or impeaching deponent generally makes deponent witness of party introducing deposition).

[20] Regarding "clear and convincing evidence," see generally *Clarke v. Cotton*, 263 Ga. 861 (440 SE2d 165) (1994).

[21] Neither the enumeration of errors nor the appellant's three supplemental briefs challenge the punitive damages as being excessive. Therefore, the landmark decision of *Time Warner Entertainment Co. v. Six Flags Over Ga.*, 254 Ga. App. 598 (563 SE2d 178) (2002), is not applicable to the case at bar.

[22] 250 Ga. App. 631, 639-640 (7) (550 SE2d 739) (2001).

[23] 247 Ga. App. 843, 848 (2) (b) (545 SE2d 385) (2001).

[24] 229 Ga. App. 220, 223 (2) (493 SE2d 622) (1997).

[25] 184 Ga. App. 755, 760 (7) (362 SE2d 769) (1987) (physical precedent only).

ing evidence. It relies on two cases, neither of which mentions the requirement that the evidence for punitive damages be clear and convincing.[26]

Before the Tort Reform Act of 1987,[27] the quantum of evidence required for an award of punitive damages was a preponderance of the evidence, and the standard of appellate review was whether there was "any evidence" to support the award.[28] Most relevant decisions of this Court do not evince any change in the standard following the enactment of OCGA § 51-12-5.1 in 1987.[29] By contrast, there is at least one panel decision in 2001, *Kodadek v. Lieberman*,[30] which affirmed the grant of a j.n.o.v. to a defendant on the issue of punitive damages although there was some evidence to support the award.[31] *Kodadek* relies in part on our full bench decision in *Uniroyal Goodrich Tire Co. v. Ford*,[32] although, as argued in a dissent to that opinion, "the 'majority' does *not* have a majority of votes for its position that the punitive damages award is unsupported."[33]

I concur specially rather than dissent because the evidence in the case at bar probably met either the pre-1987 test of "any evidence" or the higher standard required by *Kodadek*. For example, the evidence was undisputed that the defendant violated Georgia law by not keeping the required records, and numerous Cobb Electric Membership Corporation employees testified that the pesticides were sprayed in the open air rather than merely into cracks and crevices. But at some time, in an appropriate case, we should reconcile the conflicting lines of precedent.

DECIDED NOVEMBER 22, 2002 —
RECONSIDERATION DENIED DECEMBER 11, 2002

*Decker & Hallman, Richard P. Decker, Stacy L. Edelstein*, for appellant.

---

[26] *Daniell v. Clein*, 206 Ga. App. 377, 383 (3) (425 SE2d 344) (1992); *Byrne v. Reardon*, 196 Ga. App. 735, 736 (3) (397 SE2d 22) (1990).

[27] Ga. L. 1987, pp. 917-919, § 5.

[28] *Read v. Benedict*, 200 Ga. App. 4, 7 (2) (406 SE2d 488) (1991); *Petrolane Gas Svc. v. Eusery*, 193 Ga. App. 860, 862 (1) (389 SE2d 355) (1989).

[29] See, e.g., *Crosby*, supra ("the controlling question for the appellate court is whether there was any evidence to support [the] award").

[30] 247 Ga. App. 606, 610 (2) (545 SE2d 25) (2001).

[31] Deciding whether punitive damages should have been allowed may be one of those rare occasions when an appellate court must weigh the evidence. Weighing evidence de novo at the appellate level is sometimes required, for example, in criminal appeals. See, e.g., *Jackson v. Virginia*, 443 U. S. 307 (99 SC 2781, 61 LE2d 560) (1979).

[32] 218 Ga. App. 248, 255 (3), n. 2 (461 SE2d 877) (1995), aff'd in part and rev'd in part, *Ford v. Uniroyal Goodrich Tire Co.*, 267 Ga. 226 (476 SE2d 565) (1996).

[33] *Ford*, supra at 279 (Pope, P. J., dissenting).

*Owen, Gleaton, Egan, Jones & Sweeney, W. Seaborn Jones, Philippa Tibbs-Ellis*, for appellees.